OPINION OF THE COURT
GREENBERG, Circuit Judge.
I. OVERVIEW
This matter comes on before this court on appeals by defendant-appellant New Jersey Department of Environmental Protection (“NJDEP”) and intervenor-appel-lant St. Lawrence Cement Co., L.L.C. (“St.Lawrence”) from the district court’s order granting preliminary injunctive relief to plaintiffs, South Camden Citizens in Action and ten residents of the Waterfront’ South neighborhood of Camden, New Jersey. Plaintiffs brought this action pursuant to 42 U.S.C. § 1983, as well as on other bases, claiming NJDEP discriminated against them by issuing an air permit to St. Lawrence to operate a facility that would have an adverse disparate racial impact upon them in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7.
Our opinion focuses on whether, following the Supreme Court’s recent decision in Alexander v. Sandoval, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2000), plaintiffs can maintain this action under section 1983 for disparate impact discrimination in violation of Title VI and its implementing regulations. For the reasons we set forth, we hold that an administrative regulation cannot create an interest enforceable under section 1983 unless the interest already is implicit in the statute authorizing the regulation, and that inasmuch as Title VI proscribes only intentional discrimination, the plaintiffs do not have a right enforceable through a 1983 action under the EPA’s disparate impact discrimination regulations. Because the district court predicated its order granting injunctive relief on section 1983, we will reverse.
II. BACKGROUND AND PROCEDURAL HISTORY
A. Background
As we ultimately decide this appeal on a legal basis and the district court’s opinions stated the facts at length, we only need summarize the factual background of this case. Initially, we point out that the residents of Waterfront South are predominately minorities and the neighborhood is disadvantaged environmentally.[1] Water *775 front South contains two Superfund sites, several contaminated and abandoned industrial sites, and many currently operating facilities, including chemical companies, waste facilities, food processing companies, automotive shops, and a petroleum coke transfer station. Moreover, NJDEP has granted permits for operation of a regional sewage treatment plant, a trash-to-steam incinerator and a co-generation power plant in the neighborhood. As a result, Waterfront South, though only one of 23 Camden neighborhoods, hosts 20% of the city’s contaminated sites and, on average, has more than twice the number of facilities with permits to emit air pollution than exist in the area encompassed within a typical New Jersey zip code.
St. Lawrence supplies cement materials, primarily to the ready-mix concrete industry. One aspect of St. Lawrence’s business is the processing of ground granulated blast furnace slag (“GBFS”), a sand-like by-product of the steel-making industry, used in portland cement. In 1998, St. Lawrence wanted to open a GBFS grinding facility on a site in Camden owned by the South Jersey Port Corporation (the “Port”). In furtherance of this project, in March 1999 St. Lawrence signed a lease with the Port for the site and initiated discussions with NJDEP with respect to obtaining construction and operation permits for the facility, primarily focusing on the air permit that required minimizing the emission of PM10, ie., particulate matter with a diameter of 10 microns or less. NJDEP required St. Lawrence to conduct an air quality impact analysis for PM10 confirming that there would not be adverse health impacts from operation of the facility and that St. Lawrence’s operations complied with the National Ambient Air Quality Standards for PM10. St. Lawrence completed the analysis, and NJDEP accepted the result that the facility’s emissions would satisfy the established standards applicable to its operation.
On November 1, 1999, NJDEP notified St. Lawrence that the permit process was “administratively complete.” Accordingly, NJDEP permitted St. Lawrence to begin construction of the facility, which it did in late 1999. Then, on July 25, 2000, NJDEP gave notice of a public hearing to be held on August 23, 2000, addressing St. Lawrence’s draft air permit. NJDEP stated, however, that it would accept written comments on the draft permit until August 31, 2000. Approximately 120 community members voiced their opinions and concerns about St. Lawrence’s facility at the hearing, and several individuals provided NJDEP with written comments.
Thereafter, NJDEP issued a 33-page “Hearing Officer’s Report Responses to Public Comments on the Draft Air Permit” for St. Lawrence. In the report, NJDEP addressed the concerns raised by community members, including environmental equity/environmental justice, preexisting local environmental issues, St. Lawrence’s emission limits, the results of St. Lawrence’s air quality impact analysis, truck emission standards and carbon monoxide air quality evaluation results, and the protection of the health and safety of Waterfront South residents. Plaintiffs, however, filed an administrative complaint with the EPA and a request for a grievance hearing with NJDEP, as they alleged that NJDEP’s permit review procedures violated Title VI of the Civil Rights Act of 1964 because the procedures did not include an analysis of the allegedly racially disparate adverse impact of the facility. NJDEP did not respond to the grievance hearing request, and on October 31, 2000, issued St. Lawrence’s final air permit.
B. Procedural History
On February 13, 2001, plaintiffs filed a complaint against NJDEP and NJDEP Commissioner Robert C. Shinn, Jr., alleging that they violated Title VI by intentionally discriminating against them in vio *776 lation of section 601, 42 U.S.C. § 2000d, by issuing the air quality permit and further asserting that the facility in operation under the air permit would have an adverse disparate impact on them in violation of section 602, 42 U.S.C. § 2000d-1. St. Lawrence subsequently intervened with the consent of the parties. Following the submission of briefs and expert reports and oral argument, the district court issued an opinion and order on April 19, 2001, granting plaintiffs' request for a preliminary injunction. See South Camden Citizens in Action v. N.J. Dep't of Envtl. Prot., 145 F.Supp.2d 446, 505 (D.N.J.2001) ("South Camden I"). In reaching its conclusions, the court found that section 602 and its implementing regulations contained an implied private right of action. Therefore, inasmuch as the court found that plaintiffs otherwise were entitled to relief based on their disparate impact claim, it remanded the matter to NJDEP for a Title VI analysis. See id. at 473-84, 505.
South Camden I, however, had a short shelf life. On April 24, 2001, the Supreme Court issued its decision in Sandoval, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517, holding that "[n]either as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602. We therefore hold that no such right of action exists." Id. at _, 121 S.Ct. at 1523 (footnote omitted). Obviously, Sandoval eliminated the basis for the court's injunction in South Camden I, an effect that led St. Lawrence to move to dissolve the injunction. The district court, however, denied the motion, following which St. Lawrence again sought similar relief or a stay of the injunction pending appeal. The district court then allowed plaintiffs to amend their complaint to add a claim to enforce section 602 through section 1983. The court also required supplemental briefing on plaintiffs' remaining claims, namely, whether plaintiffs' intentional discrimination charge and/or their section 1983 claim 12 could provide an alternate basis for relief. On May 10, 2001, the court issued a supplemental opinion and order continuing the preliminary injunction based on plaintiffs' section 1983 claim and again remanding the matter to NJDEP for a Title VI analysis. See South Camden Citizens in Action v. N.J. Dep't of Envtl. Prot., 145 F.Supp.2d 505 (D.N.J.2001) (South Camden II). In reaching its result the court relied, inter alia, on Powell v. Ridge, 189 F.3d 387, 403 (3d Cir.), cert. denied, 528 U.S. 1046, 120 S.Ct. 579, 145 L.Ed.2d 482 (1999), in which we held that there was a private right of action available to enforce a regulation implementing Title VI and that a disparate impact discrimination claim could be maintained under section 1983 for a violation of a regulation promulgated pursuant to section 602. See South Camden II, 145 F.Supp.2d at 520, 525, 543. Immediately thereafter, St. Lawrence unsuccessfully moved in the district court for a stay of the preliminary injunction pending appeal.
St. Lawrence appealed to this court, and on May 15, 2001, filed with us a motion to suspend or, in the alternative, to modify the preliminary injunction pending appeal, as well as a request for expedited review of the appeal. On May 29, 2001, NJDEP requested a stay of the remand process from the district court, but on June 4, 2001, the district court denied that request. NJDEP then made the same application to this court on June 6, 2001, but we denied its motion on June 11, 2001. On June 12, 2001, however, we granted St. Lawrence's request for expedited review, and on June 15, 2001, we granted St. Lawrence's request to suspend the preliminary injunction pending appeal.
III. DISCUSSION
As we have indicated, plaintiffs in their amended complaint sought an injunc *777 tion under section 1983 preventing operation of St. Lawrence’s GBFS grinding facility.[2] The district court found that plaintiffs stated a claim under section 1983 against NJDEP for violating section 602 and its implementing regulations by failing to consider the potentially adverse discriminatory impact of permitting operation of the facility, and therefore enjoined its operation until NJDEP made such a determination.[3] We review the district court’s order granting a preliminary injunction for abuse of discretion, although we review factual findings for clear error and questions of law de novo. See AT & T v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir.1994).
We often have recognized that injunctive relief, particularly preliminary relief, is an “extraordinary remedy ... which should be granted only in limited circumstances.” Id. (citation omitted). To obtain a preliminary injunction, the moving party must demonstrate: (1) the reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured if relief is not granted. Moreover, the district court also should take into account, when relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest. See In re Arthur Treacher’s Franchisee Litig., 689 F.2d 1137, 1143 (3d Cir.1982). Thus, “a failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction.” Id. at 1143.
We first consider the probability of plaintiffs’ success in the litigation and, indeed, as we find that their ease is legally insufficient, we will go no further. Naturally, in view of Sandoval, the overarching legal issue on this appeal is whether plaintiffs can advance a cause of action to enforce section 602 of Title VI and its implementing regulations through section 1983. If they cannot, then the only basis on which they can obtain relief is to demonstrate that the NJDEP engaged in intentional discrimination, a possibility that we do not address on this appeal.
We start our legal analysis with a consideration of Sandoval in which the Court held that a private right of action is not available to enforce disparate impact regulations promulgated under Title VI,[4] *778 thus overruling Powell at least to the extent that it held to the contrary. See Sandoval, 532 U.S. at _, 121 S.Ct. at 1523. In Sandoval, the Court considered a challenge to the Alabama Department of Public Safety’s official policy of administering its driver’s license examination only in English as violative of Title VI and its implementing regulations. See id. at _, 121 S.Ct. at 1515. The Court held that “[n]either as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602. We therefore hold that no such right of action exists.” Id. at _, 121 S.Ct. at 1523. *In reaching its result in Sandoval, the Court began by listing three aspects of Title VI that “must be taken as given”: (1) private individuals may sue to enforce section 601 of Title VI and obtain both injunctive relief and damages; (2) section 601 prohibits only intentional discrimination; and (3) for the purposes of the case, regulations promulgated pursuant to section 602 validly may proscribe disparate impact discrimination even though it is permissible under section 601. See id. at _, 121 S.Ct. at 1516-17. Then, the Court considered whether section 602 regulations conferred a private right of action, looking to its precedent interpreting Title VI and to the text and structure of Title VI. See id. at _, 121 S.Ct. at 1519. First, the Court noted, based on its analysis of its holdings in its prior Title VI cases, that it previously had not held that there is such a private right of action under section 602. See id. at _, 121 S.Ct. at 1517-21 (citing Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (holding that section 601 prohibits disparate impact discrimination); Cannon v. Univ. of Chicago, 441 U.S. 677, 694, 99 S.Ct. 1946, 1956, 60 L.Ed.2d 560 (1979) (holding that private right of action exists to enforce Title IX, which is patterned after Title VI); Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 287, 98 S.Ct. 2733, 2746, 57 L.Ed.2d 750 (1978) (holding, contrary to Lau, that section 601 proscribes only those classifications that would violate the Equal Protection Clause of the Fifth Amendment, namely intentional discrimination); Guardians Ass’n v. Civil Serv. Comm’n, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (affirming Bakke’s holding that section 601 prohibits only intentional discrimination); Alexander v. Choate, 469 U.S. 287, 293, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985) (same)).
The Court then found that section 602’s text and structure did not evince an intent to create a private right of action and that the regulations alone were insufficient to create a private right of action. See id. at _, 121 S.Ct. at 1520-22 (“Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right *779 that Congress has not.”). Therefore, the Court held that a private right of action was not available to enforce regulations promulgated under section 602. See id. at _, 121 S.Ct. at 1523. However, inasmuch as the plaintiffs in Sandoval did not advance a cause of action under section 1983 to enforce Title YI and its implementing regulations, the majority did not consider whether such an action is available.[5]
Resolution of this issue, therefore, requires us to examine whether disparate impact regulations promulgated pursuant to section 602 may, and if so do, create a right that may be enforced through a section 1983 action.
Section 1983 provides, in relevant part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be hable to the party injured in any action at law, suit in equity, or other proper proceeding for redress.
Therefore, section 1983 provides a remedy for deprivation under color of state law of “any rights ... secured by the Constitution and laws.” In Maine v. Thiboutot, 448 U.S. 1, 6-8, 100 S.Ct. 2502, 2505-06, 65 L.Ed.2d 555 (1980), the Supreme Court interpreted this language and held that causes of action under section 1983 are not limited to claims based on constitutional or equal rights violations. Rather, certain rights created under federal statutes are enforceable through section 1983 as well. This rule, however, is limited by two well-recognized exceptions. First, a section 1983 remedy is not available “where Congress has foreclosed such enforcement of the statute in the enactment itself.” Wright v. City of Roanoke Redevelopment & Hous. Auth., 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987). Second, the remedy is not available “where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983.” Id.
The Supreme Court has established a three-part test to determine whether a federal statute creates an individual right enforceable through a section 1983 action:
First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so ‘vague and amorphous’ that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than prec-atory, terms.
*780 Blessing v. Freestone, 520 U.S. 329, 340-41, 117 S.Ct. 1353, 1359-60, 137 L.Ed.2d 569 (1997). If a plaintiff satisfies each of these elements, and therefore establishes and identifies a federal, right that allegedly has been violated, a rebuttable presumption that the right is enforceable through section 1983 arises. See id. at 341, 117 S.Ct. at 1360; see also Banks v. Dallas Housing Auth., 271 F.3d 605, 2001 WL 1285391, at *4 (5th Cir. Oct.24, 2001). We have found two circumstances, which in harmony with Wright, are sufficient to rebut this presumption: where “Congress specifically foreclosed a remedy under § 1983,[either] expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.” Powell, 189 F.3d at 401 (citations omitted). In the former case, the plaintiffs claim must fail. In the latter case, however, the burden shifts to the defendant to “make the difficult showing that allowing a § 1983 action to go forward in these circumstances ‘would be inconsistent with Congress’ carefully tailored scheme.’ ” Id. (quoting Blessing, 520 U.S. at 346, 117 S.Ct. at 1362).
Here, plaintiffs seek to enforce a prohibition on disparate impact discrimination that does not appear explicitly in Title VI, but rather is set forth in EPA regulations. They contend that the regulations are a valid interpretation of Title VI.[6] Section 601 of Title VI provides:
No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
42 U.S.C. § 2000d. Section 602 provides, in relevant part:
Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d [Section 601] of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing financial assistance in connection with which the action is taken.
Id. § 2000d-1. Finally, the EPA regulations at issue provide:
No person shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving EPA assistance on the basis of race, color, [or] national origin....
A recipient shall not use criteria or methods of administering its program which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, national origin, or sex.
*781 40 C.F.R. §§ 7.30 & 7.35(b). According to plaintiffs, these statutory provisions and their complementary regulations prohibiting discriminatory impacts in administering programs create a federal right enforceable through section 1983.
This contention raises the question of whether a regulation can create a right enforceable through section 1983 where the alleged right does not appear explicitly in the statute, but only appears in the regulation. The district court found that the Supreme Court, as well as this court, have found that a. regulation may create an enforceable right, see South Camden II, 145 F.Supp.2d at 526-27 (citing Wright, 479 U.S. at 418, 107 S.Ct. at 766; W. Va. Univ. Hosp. v. Casey, 885 F.2d 11, 18 (3d Cir.1989); Alexander v. Polk, 750 F.2d 250 (3d Cir.1984)), and therefore concluded that the three-prong Blessing test applied to determine whether the EPA regulations indeed created a federal right. See id. at 529. For the reasons that follow, however, we are satisfied that the district court’s conclusion was erroneous. Thus, as the plaintiffs do not advance any federal right to enforce, the district court erred in granting relief on the basis of section 1983.
In considering whether a regulation in itself can establish a right enforceable under section 1983, we initially point out that a majority of the Supreme Court never has stated expressly that a valid regulation can create such a right. In Guardians Ass’n Justice Stevens, joined by Justices Brennan and Blackmun, wrote: “[I]t is clear that the § 1983 remedy is intended to redress the deprivation of rights secured by all valid federal laws, including statutes and regulations having the force of law.” See Guardians Ass’n, 463 U.S. at 638, 103 5.Ct. at 3251. According to them, the rationale of Thiboutot applied equally to statutes and administrative regulations having the force of law. See id. at 638 n. 6, 103 S.Ct. at 3251 n. 6. But later in Wright, four Justices expressed the contrary view. See Wright, 479 U.S. at 437-38, 107 S.Ct. at 777-78 (O’Connor, J., dissenting). Justice O’Connor, joined by Chief Justice Rehnquist, Justice Powell, and Justice Scalia, wrote in dissent:
In the absence of any indication in the language, legislative history, or administrative interpretation of the Brooke Amendment that Congress intended to create an enforceable right to utilities, it is necessary to ask whether administrative regulations alone could create such a right. This is a troubling issue not briefed by the parties, and I do not attempt to resolve it here. The Court’s questionable reasoning that, because for four years HUD gave somewhat less discretion to the PHA’s in setting reasonable utilities allowances, HUD understood Congress to have required enforceable utility standards, apparently allows it to sidestep the question. I am concerned, however, that lurking behind the Court’s analysis may be the view that, once it has been found that a statute creates some enforceable right, any regulation adopted within the purview of the statute creates rights enforceable in federal courts, regardless of whether Congress or the promulgating agency ever contemplated such a result. Thus, HUD’s frequently changing views on how best to administer the provision of utilities to public housing tenants becomes the focal point for the creation and extinguishment of federal ‘rights.’ Such a result, where determination of § 1983 ‘rights’ has been unleashed from any connection to congressional intent, is troubling indeed.

Id.

Notwithstanding the foregoing cautionary language, the district court relied on Wright in holding that federal regulations may create rights enforceable through sec *782 tion 1983. In Wright, the plaintiffs alleged the housing authority violated a federal statute imposing a rent ceiling and the statute’s implementing regulations which required public housing authorities to include a reasonable utility allowance in tenants’ rent. See id. at 419, 107 S.Ct. at 768. The defendants argued that neither the statute nor the regulations gave the tenants a right enforceable through section 1983. See id. at 429-30, 107 S.Ct. at 773. In response, the Court stated:
We perceive little substance in this claim. The Brooke Amendment could not be clearer: as further amended in 1981, tenants could be charged as rent no more and no less than 30 percent of them income. This was a mandatory limitation focusing on the individual family and its income. The intent to benefit tenants is undeniable. Nor is there any question that HUD interim regulations, in effect when this suit began, expressly required that a ‘reasonable’ amount for utilities be included in rent that a PHA was allowed to charge, an interpretation to which HUD has adhered both before and after the adoption of the Brooke Amendment. HUD’s view is entitled to deference as a valid interpretation of the statute, and Congress in the course of amending that provision, has not disagreed with it.
Respondent nevertheless asserts that the provision for a ‘reasonable’ allowance for utilities is too vague and amorphous to confer on tenants an enforceable ‘right’ within the meaning of § 1983 and that the whole matter of utility allowances must be left to the discretion of the PHA, subject to supervision by HUD. The regulations, however, defining the statutory concept of ‘rent’ as including utilities, have the force of law ..., they specifically set out guidelines that the PHAs were to follow in establishing utility allowances, and they require notice to tenants and an opportunity to comment on proposed allowances. In our view, the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under Pennhurst [State School & Hospital v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)] and § 1983, rights that are not, as respondent suggests, beyond the competence of the judiciary to enforce.
Id. at 430-32, 107 S.Ct. at 773-75 (footnotes omitted).[7]
As we have indicated, the district court held, and the appellees argue here, that Wright stands for the proposition that valid federal regulations may create rights enforceable under section 1983, to which the Blessing analysis applies. Therefore, the appellees argue that because the EPA’s section 602 regulations are valid and enforceable, we should apply the Blessing analysis and conclude that the regulations create rights enforceable through section 1983.
The district court’s holding was, however, erroneous because, as the foregoing quotation from the Court’s opinion makes clear, Wright dealt with an issue that differs from that presented in the district court and here. There, the Court, in finding the statute and its implementing regulations created a right enforceable through section 1983, focused on tying the right to a reasonable utility allowance to Congress’ intent to create federal rights through the statute. The Court looked first to the statutory provision creating the ceiling on *783 tenants’ rent, describing it as “a mandatory limitation focusing on the individual family and its income.” Id. at 430, 107 S.Ct. at 773-74. Further, it stated that Congress’ intent with regard to the statute to benefit tenants was “undeniable.” Id. at 430, 107 S.Ct. at 774. Having reached this conclusion, it turned to the regulations and found that they were entitled to deference as valid administrative interpretations of the statute. Id., 107 S.Ct. at 774. It afforded this deference, however, after having found that Congress had conferred upon plaintiffs that right by statute. Id., 107 S.Ct. at 773.
Clearly, therefore, the regulation at issue in Wright merely defined the specific right that Congress already had conferred through the statute. See id. at 430 n. 11 & 431, 107 S.Ct. at 774 & n. 11 (rejecting “respondent’s argument that the Brooke Amendment’s rent ceiling applies only to the charge for shelter and that the HUD definition of rent as including a reasonable charge for utilities is not authorized by the statute” and stating regulations “defin[ed] the statutory concept of ‘rent’ ”). There should be no doubt on this point, for the Court plainly stated that “the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under Pennhurst and § 1983, rights that are not, as respondent suggests, beyond the competence of the judiciary to enforce.” Id. at 432, 107 S.Ct. at 774-75 (emphasis added). Therefore, the Wright Court located the alleged right in the statutory provision and then relied upon the implementing regulations to define and interpret that right. Critically, as pertains to this case, Wright does not hold that a regulation alone' — i.e., where the alleged right does not appear explicitly in the statute, but only appears in the regulation — may create an enforceable federal right. It is thus manifest that, inasmuch as the disparate impact regulations go far beyond the intentional discrimination interdiction in section 601, the district court’s reliance on Wright was misplaced.
Similarly, although also relied upon by the district court, none of our opinions in Alexander, Casey, or Powell nor that of the Court of Appeals for the Ninth Circuit in Buckley v. City of Redding, 66 F.3d 188 (9th Cir.1995), justifies the district court’s conclusion that valid regulations may create rights enforceable under section 1983. In Alexander, we held that federal regulations governing the administration of the Supplemental Food Program for Women, Infants and Children created rights enforceable under section 1983 for recipients of program assistance. See Alexander, 750 F.2d at 261. But the right enforceable through section 1983, namely notice of the right to a fair hearing upon termination of benefits, could be traced to and was consistent with the statute as it provided for cash grants to local agencies to enable them to carry out health and nutrition programs to make supplemental food available to pregnant and lactating women and infants. Accordingly, the statute created a right to supplemental food for those who qualified. See id. at 253 & n. 3.
We recognize that in Alexander we never expressly identified the right as stemming from the statute. Nevertheless we did not expressly analyze the question of whether a federal regulation could create an enforceable section 1983 right. Instead, after stating the general rule that violations of federal statutes may be actionable under section 1983 except where Congress has foreclosed section 1983 enforcement or the statute does not create enforceable rights, we simply concluded that the regulation created an enforceable right. See id. at 259.
But Alexander did not involve a circumstance in which the regulations attempted to create a federal right beyond any that Congress intended to create in enacting *784 the statute. Furthermore, we decided Alexander in 1984, well before the Supreme Court refined its analysis to focus directly on Congress’ intent to create enforceable rights and to confine its holdings to the limits of that intent. See Blessing, 520 U.S. at 341, 117 S.Ct. at 1360-61 (concentrating on Congress’ intent to create rights in statute enforceable through section 1983); Suter v. Artist M., 503 U.S. 347, 357, 112 S.Ct. 1360, 1367, 118 L.Ed.2d 1 (1992) (same); Wilder v. Va. Hosp. Ass’n, 496 U.S. 498, 510, 110 S.Ct. 2510, 2517-18, 110 L.Ed.2d 455 (1990) (same); Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110-11, 110 S.Ct. 444, 451, 107 L.Ed.2d 420 (1989) (same); Wright, 479 U.S. at 430, 107 S.Ct. at 774 (focusing on Congress’ intent to create rights in statute enforceable through section 1983, and finding implementing regulation defined right). Therefore, Alexander is distinguishable from this case.
So, too, is Casey. There, we stated, citing only Wright and Alexander, that “valid federal regulations as well as federal statutes may create rights enforceable under section 1983.” Casey, 885 F.2d at 18. The issue in Casey, however, was only whether the federal Medicaid statute, not its implementing regulations, created a federal right enforceable through section 1983. See id. at 17 (“The threshold issue in this case is whether [the plaintiff] can assert a cause of action against the defendant state officials under 42 U.S.C. § 1983 for alleged violation of the federal medicaid statute.”). Therefore, our broader statement was dicta not binding here.
Plaintiffs place much reliance on Powell v. Ridge, 189 F.3d at 403, in which we indicated that a disparate impact discrimination claim could be maintained under section 1983 for a violation of a regulation promulgated pursuant to section 602. There, the plaintiffs brought a Title VI action against the Commonwealth of Pennsylvania, challenging its practices in funding public education on the ground that they had a racially discriminatory effect. See id. at 391. On appeal, we considered, among other things, whether there was a private right of action available to enforce a regulation implementing Title VI, as well as whether a plaintiff can maintain a claim under section 1983 for a violation of that regulation. See id. We answered both questions in the affirmative, stating that section 602 and the Department of Education regulation at issue provided a private right of action, and that plaintiffs also could utilize section 1983 to redress defendants’ alleged violation of the statute and regulation. See id. at 399-400, 403.
Powell, however, should not be over-read. Initially, it held that section 602 and the regulations under it included a private right of action. Moreover, in then authorizing the section 1983 action we merely rejected three specific arguments: (1) that the individual defendants were not “persons” amenable to suit under section 1983;[8] (2) that Title VI possessed a comprehensive enforcement scheme that precluded the assertion of the section 1983 claim; and (3) that our precedents barring certain claims under Title IX of the Education Amendments of 1972 should have barred the action in Powell as well. See Powell, 189 F.3d at 400-03. But Powell did not analyze the foundation issue that is central here, i.e., whether a regulation in itself can create a right enforceable under section 1983. In Powell, we seemed simply to assume for section 1983 purposes that it could. See id. at 401 (“Once a plaintiff has identified a federal right that *785 has allegedly been violated, there arises a ‘rebuttable presumption that the right is enforceable under § 1983.’ ”). Thus, while plaintiffs rely heavily on Powell, that reliance is misplaced, and, accordingly, quite aside from the impact of Sandoval, Powell could not control the outcome here.[9]
Similarly, the district court’s rebanee on Buckley was misplaced. The issue there was whether the Federal Aid in Sport Fish Restoration Act and its interpretive regulations created an enforceable federal statutory right under section 1983. See Buckley, 66 F.3d at 189-90. The court, after analyzing the relevant statutory and regulatory language, held that it did. See id. at 193. Inasmuch as the court stated expressly that it was determining whether the federal statute and its implementing regulations conferred a section 1983 right and not whether such a right arose under the implementing regulations alone, Buckley is distinguishable. See also Powell, 189 F.3d at 401; Farley v. Philadelphia Hous. Auth., 102 F.3d 697, 699 (3d Cir.1996) (“[The] cause of action arises strictly under[the statutory provision.] Regulation § 966.57(b) merely interprets that section.”); Doe v. District of Columbia, 93 F.3d 861, 867 (D.C.Cir.1996) (analyzing both statute and its accompanying regulations in determining whether enforceable section 1983 right existed); Tony L. v. Childers, 71 F.3d 1182, 1189 (6th Cir.1995) (same); City of Chicago v. Lindley, 66 F.3d 819, 827 (7th Cir.1995) (same); Martinez v. Wilson, 32 F.3d 1415, 1421 & n. 4 (9th Cir.1994) (same); Howe v. Ellenbecker, 8 F.3d 1258, 1263 (8th Cir.1993) (same), overruled by Blessing, 520 U.S. at 348, 117 S.Ct. at 1363; Albiston v. Me. Comm’r of Human Servs., 7 F.3d 258, 265 (1st Cir.1993) (same), overruled by Blessing, 520 U.S. at 348, 117 S.Ct. at 1363; Pinnacle Nursing Home v. Axelrod, 928 F.2d 1306, 1313-14 (2d Cir.1991) (same); Samuels v. District of Columbia, 770 F.2d 184, 195 (D.C.Cir.1985) (same).
There are cases in other circuits addressing the question of whether a regulation alone may create a right enforceable under section 1983. The Courts of Appeals for the Fourth and Eleventh Circuits concluded that they may not and the Court of Appeals for the Sixth Circuit decided to the contrary. In Smith v. Kirk, 821 F.2d 980, 982 (4th Cir.1987), the court considered whether the state’s use of an economic needs test on disabled persons requesting vocational rehabilitation services stated a cause of action under section 1983 for violations of the Social Security Act and its implementing regulations. After concluding that nothing in the statute created an entitlement to vocational rehabilitation services, the court addressed the plaintiffs argument that the mandatory language utilized in the implementing regulations created such a right. See id. at 984. The court rejected this claim, stating:
*786 An administrative regulation ... cannot create an enforceable § 1983 interest not already implicit in the enforcing statute. The Supreme Court has never held that one could — to the contrary, members of the Court have expressed doubt that ‘administrative regulations alone could create such a right.’
Id. (quoting Wright, 479 U.S. at 437, 107 S.Ct. at 777 (O’Connor, J., dissenting)). Therefore, the court affirmed the district court’s dismissal of the plaintiffs section 1983 cause of action. See id.; see also Former Special Project Employees Ass’n v. City of Norfolk, 909 F.2d 89, 94 (4th Cir.1990) (following Smith and concluding that “because [the statutory provision] does not provide an enforceable right, the [administrative regulation is] irrelevant to our consideration of the employee’s claim under section 1983”).
The Court of Appeals for the Eleventh Circuit reached a similar conclusion in Harris v. James, 127 F.3d 993 (11th Cir.1997). There, the court considered whether a Medicaid regulation requiring states to provide non-emergency transportation to and from providers created a right to such transportation enforceable under section 1983. See id. at 996. The court began by reviewing the Supreme Court’s precedent governing whether violations of federal statutes create section 1983 causes of action. See id. at 997-1005. Then, the court turned to the specific question of whether the regulation created a federal right. See id. at 1005. There, like here, the requirement plaintiffs sought to enforce “appeared] explicitly not in the Medicaid Act, but in a federal regulation,” with the plaintiffs claiming that “the regulatory and statutory provisions create[d] a federal right to transportation to and from providers.” Id. The court rejected this argument. See id. at 1009-10.
In doing so, it first acknowledged the relative dearth of authority on this precise issue, noting that courts of appeals are split and that the Supreme Court never definitively addressed the matter. See id. at 1005-07 (citing Wright, 479 U.S. at 437-38, 107 S.Ct. at 777-78 (O’Connor, J., dissenting); Guardians Ass’n, 463 U.S. at 638, 103 S.Ct. at 3251; Loschiavo v. City of Dearborn, 33 F.3d 548, 551 (6th Cir.1994); Smith, 821 F.2d at 984). The court then analyzed the majority opinion in Wright to ascertain whether it rejected the dissent’s view of cases involving federal regulations, namely that administrative regulations alone cannot create enforceable federal rights, and found that it did not. See Harris v. James, 127 F.3d at 1007-08 (“We conclude that the Wright majority did not hold that federal rights are created either by regulations’ alone’ or by any valid administrative interpretation of a statute creating some enforceable right.”). Therefore, the court rejected the argument that a “ ‘federal right’ [may be found] in any regulation that in its own right meets the three-prong ‘federal rights’ test,” as well as the argument that “enforceable rights [may be found] in any valid administrative interpretation of a statute that creates some enforceable right.” Id. at 1008. Instead, it adopted the rule that:
[S]o long as the statute itself confers a specific right upon the plaintiff, and a valid regulation merely further defines or fleshes out the content of that right, then the statute — ‘in conjunction with the regulation’ — may create a federal right as further defined by the regulation.
[But], if the regulation defines the content of a statutory provision that creates no federal right under the three-prong test, or if the regulation goes beyond explicating the specific content of the statutory provision and imposes distinct obligations in order to further *787 the broad objectives underlying the statutory provision, we think the regulation is too far removed from Congressional intent to constitute a ‘federal right’ enforceable under § 1983. To hold otherwise would be inconsistent with the driving force of the Supreme Court precedent requiring a Congressional intent to create federal rights and with the Supreme Court’s directive that courts must find that Congress has unambiguously conferred federal rights on the plaintiff.
Id. at 1009 (footnotes omitted).
Applying this rule, the court concluded that the regulation did not define the content of any specific right conferred upon the plaintiffs by statute because the “nexus between the regulation and Congressional intent to create federal rights [was] simply too tenuous to create an enforceable right to transportation.” Id. at 1009-10. Finally, the court stated:
It may be that each of these statutes creates some federal right; similarly, it may be that the transportation regulation is a valid interpretation of each of these provisions under Chevron. However, we[1] do not think these two factors, even if we found both to be true, would add up to a federal right of transportation. In each case the transportation regulation would be valid not because it reasonably defines the content of rights created by the statutory provisions, as did the regulation in Wright, but only because the regulation furthers the broad objectives underlying each statutory provision.... Instead, if the regulation is a valid interpretation of these provisions, it would be because transportation may be a reasonable means of ensuring the prompt provision of assistance, comparable assistance, or choice among providers. Such links to Congressional intent may be sufficient to support the validity of a regulation; however, we think they are too tenuous to support a conclusion that Congress has unambiguously conferred upon Medicaid recipients a federal right to transportation enforceable under § 1983.
Id. at 1011-12 (footnote omitted); see Kissimmee River Valley Sportsman Ass’n v. City of Lakeland, 250 F.3d 1324, 1327 (11th Cir.2001) (applying Harris and concluding that “even more clearly ... the instant regulation imposes new and ‘distinct obligations’ not found in the statute itself, and thus is ‘too far removed from the Congressional intent to constitute a federal right enforceable under § 1983’ ”), cert. denied, _ U.S. _, 122 S.Ct. 613, _ L.Ed.2d _ (2001); Doe v. Chiles, 136 F.3d 709, 717 (11th Cir.1998) (utilizing Harris analysis and finding federal right was created by statute and regulations that “further define[d] the contours of the statutory right” at issue).
The Court of Appeals for the Sixth Circuit, however, reached the opposite result in Loschiavo. There, the court held that because administrative regulations have the force of law, they may create enforceable rights under section 1983. See Los-chiavo, 33 F.3d at 551 (citing Wright, 479 U.S. at 431, 107 S.Ct. at 774). Accordingly, the court concluded that the regulation at issue created a federal right enforceable through section 1983. See id. at 552-53; see also Levin v. Childers, 101 F.3d 44, 47 (6th Cir.1996) (stating Loschiavo court held “plaintiffs may use Section 1983 to enforce not only constitutional rights, but also those rights defined by federal statutes [and federal regulations]”).[10]
Nevertheless, in light of the foregoing analysis, we reject the Loschiavo ap *788 proach. To start with, we reiterate that in Sandoval the Court made the critical point that “[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not.” 532 U.S. at _, 121 S.Ct. at 1522. Furthermore, as we noted previously, the Court’s focus in Wright was on tying Congress’ intent to create federal rights through the statute to the particular federal right claimed. See Wright, 479 U.S. at 430, 107 S.Ct. at 774; Harris, 127 F.3d at 1008-09. It was of paramount importance that Congress intended to create such a right in the statute, with the regulation then defining the right that Congress already conferred through the statute. See Wright, 479 U.S. at 430 n. 11 & 431, 107 S.Ct. at 774 n. 11 & 775; Harris, 127 F.3d at 1008.
Moreover, it is apparent that in the Court’s section 1983 jurisprudence after Wright dealing with whether a plaintiff is advancing an enforceable right, the primary consideration has been to determine if Congress intended to create the particular federal right sought to be enforced. See Suter, 503 U.S. at 357, 112 S.Ct. at 1367 (stating issue as “[d]id Congress, in enacting the Adoption Act, unambiguously confer upon the child beneficiaries of the Act a right to enforce the requirement that the State make ‘reasonable efforts’ to prevent a child from being removed from his home, and once removed to reunify the child with his family?”). Inasmuch as the Loschiavo court’s approach first did not examine whether Congress intended to create the particular right at issue, we reject its holding that a federal right may be found in any federal regulation that, in its own right, meets the Blessing test.
Therefore, we follow Wright, in accordance with its actual holding, the teaching of Sandoval, and the holdings in Harris and Smith, which we believe the courts of appeals decided correctly, and hold that the EPA’s disparate impact regulations cannot create a federal right enforceable through section 1983. To the extent, if any, that Powell might be thought on a superficial reading to suggest otherwise, in the light of Sandoval we cannot regard it as stating controlling law. Since the time of the Supreme Court’s decision in Sandoval, it hardly can be argued reasonably that the right alleged to exist in the EPA’s regulations, namely to be free of disparate impact discrimination in the administration of programs or activities receiving EPA assistance, can be located in either section 601 or section 602 of Title VI.
In reaching our result, we emphasize the following. Sandoval made it clear that section 601 proscribes intentional discrimination only. See Sandoval, 532 U.S. at _, 121 S.Ct. at 1516. In discussing whether section 602 and its implementing regulations created an implied right of action, the Court first considered whether Congress intended to create a federal right in favor of the plaintiffs.[11] See id. at _, *789 121 S.Ct. at 1520-21. After reviewing the relevant language of section 602, the Court stated:
It is immediately clear that the ‘rights-creating’ language so critical to the Court’s analysis in Cannon of § 601, is completely absent from § 602. Whereas § 601 decrees that ‘[n]o person ... shall ... be subjected to discrimination,’ the text of § 602 provides that ‘[e]ach Federal department and agency ... is authorized and directed to effectuate the provisions of [§ 601].’ Far from displaying congressional intent to create new rights, § 602 limits agencies to ‘ef-fectuat[ing]’ rights already created by § 601. And the focus of § 602 is twice removed from the individuals who will ultimately benefit from Title Vi’s protection. Statutes that focus on the person regulated rather than the individuals protected create ‘no implication of an intent to confer rights on a particular class of persons.’ Section 602 is yet a step further removed: it focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating.... So far as we can tell, this authorizing portion of § 602 reveals no congressional intent to create a private right of action.
Nor do the methods that § 602 goes on to provide for enforcing its authorized regulations manifest an intent to create a private remedy; if anything, they suggest the opposite.... Whatever these elaborate restrictions on agency enforcement may imply for the private enforcement of rights created outside of § 602, they tend to contradict a congressional intent to create privately enforceable rights through § 602.
Id. at _, 121 S.Ct. at 1521 (citations omitted). Therefore, the Court found that there was no evidence of congressional intent to create new rights under section 602. See id. Rather, “§ 602 limits agencies to ‘effectuating]’ rights already created by § 601.”[12] Id.
Inasmuch as the Court found previously that the only right conferred by section 601 was to be free of intentional discrimi *790 nation, it does not follow that the right to be free from disparate impact discrimination can be located in section 602. In fact, it cannot. In sum, the regulations, though assumedly valid, are not based on any federal right present in the statute. Thus, this case is very similar to Smith and Hams. Here, as there, the regulations do more than define or flesh out the content of a specific right conferred upon the plaintiffs by Title VI. Instead, the regulations implement Title VI to give the statute a scope beyond that Congress contemplated, as Title VI does not establish a right to be free of disparate impact discrimination. Thus, the regulations are “too far removed from Congressional intent to constitute a ‘federal right’ enforceable under § 1983.” Harris, 127 F.3d at 1009.
Accordingly, if there is to be a private enforceable right under Title VI to be free from disparate impact discrimination, Congress, and not an administrative agency or a court, must create this right. In this regard, we point out what should be obvious: the scope of conduct subject to being interdicted by limitations on actions having a disparate impact is far broader than limitations on intentional discrimination. Thus, we reiterate that if Title VI is to go so far as to have the application that plaintiffs wish, Congress should take it there.
We emphasize that the implications of this case are enormous and obviously, as the appearance of the many amici curiae attests, have not been lost on interested parties. It is plain that in view of the pervasiveness of state and local licensing provisions and the likely applicability of Title VI to the agencies involved, the district court’s opinion has the potential, if followed elsewhere, to subject vast aspects of commercial activities to disparate impact analyses by the relevant agencies. Indeed, we noted in Powell that “[a]t least 40 federal agencies have adopted regulations that prohibit disparate-impact discrimination pursuant to [section 602].” Powell, 189 F.3d at 393. While we do not express an opinion on whether that would be desirable, we do suggest that if it is to happen, then Congress and not a court should say so as a court’s authority is to interpret rather than to make the law.[13]
IV. CONCLUSION
We sum up our conclusions as follows. The Supreme Court’s primary concern in considering enforceability of federal claims under section 1983 has been to ensure that Congress intended to create the federal right being advanced. See Suter, 503 U.S. at 357, 112 S.Ct. at 1367; Wright, 479 U.S. at 431, 107 S.Ct. at 774. Accordingly, we hold that a federal regulation alone may not create a right enforceable through section 1983 not already found in the enforcing statute. Similarly, we reject the argument that enforceable rights may be found in any valid administrative implementation of a statute that in itself creates some enforceable right. Applying these rules here, it is clear that, particularly in light of *791 Sandoval, Congress did not intend by adoption of Title VI to create a federal right to be free from disparate impact discrimination and that while the EPA’s regulations on the point may be valid, they nevertheless do not create rights enforceable under section 1983. The district court erred as a matter of law in concluding otherwise and therefore also erred in finding that plaintiffs are likely to succeed on the merits of their claim. Consequently, we will reverse the district court’s order of May 10, 2001, granting preliminary injunctive relief and will remand the case to the district court for further proceedings consistent with this opinion.

. The Waterfront South community is comprised of 63% African-American, 28.3% Hispanic, and 9% white residents.

. The district court had jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343, and we have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

. The parties agree that the NJDEP receives grants of federal financial assistance so as to be subject to Title VI of the Civil Rights Act of 1964, including sections 601 and 602.

. We have set forth conditions that can lead to the recognition of a private right of action not explicitly created as follows:
When a statute does not explicitly supply a private right of action, two occasionally intersecting avenues may be explored for a possible private right of enforcement. First, an implied private right of action to enforce the statute may exist directly under the statute in accordance with the four-factor analysis of Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). To establish an implied private right of action under Cort v. Ash, the plaintiff must satisfy the first requirement — that the statute creates a federal right in favor of the plaintiff. The plaintiff must then satisfy the three remaining Cort v. Ash requirements relating to the existence of a remedy-that Congress intended to create a remedy, that the remedy is consistent with the legislative scheme, and that the cause of action is not traditionally relegated to state law. In sum, under Cort v. Ash the plaintiff bears the burden of establishing not only the existence of a right, but also the existence of an intended private remedy.
In appropriate cases, the second avenue for private enforcement of a federal statute is § 1983. In determining whether a pri *778 vate right of action exists under § 1983, only two inquiries are relevant: one, whether the statute alleged to have been violated creates a federal right in favor of the plaintiff, and the other, whether Congress has foreclosed the remedy of private enforcement. The § 1983 analysis intersects with the Cort v. Ash analysis insofar as the plaintiff under both analyses must establish the creation of a federal right. With respect to the existence of a remedy, however, the contrast between the two analyses is stark. Under Cort v. Ash the plaintiff must establish that Congress intended the remedy. Under § 1983 analysis, on the other hand, once a federal right is established, the existence of a remedy is presumed because § 1983 itself provides the authorization for private enforcement. The burden is on the defendant to establish that Congress intended to foreclose private enforcement.
W.Va. Univ. Hosp. v. Casey, 885 F.2d 11, 18 n. 1 (3d Cir.1989). In Sandoval, the Court focused exclusively on whether Congress had created a federal right in favor of the plaintiff, the same essential question at issue here.

. In his dissent, Justice Stevens stated the following with regard to section 1983:
[T]o the extent that the majority denies relief to the respondents merely because they neglected to mention 42 U.S.C. § 1983 in framing their Title VI claim, this case is something of a sport. Litigants who in the future wish to enforce the Title VI regulations against state actors in all likelihood must only reference § 1983 to obtain relief; indeed, the plaintiffs in this case (or other similarly situated individuals) presumably retain the option of re-challenging Alabama’s English-only policy in a complaint that invokes § 1983 even after today's decision.
Sandoval, 532 U.S. at _, 121 S.Ct. at 1527 (Stevens, J., dissenting). The majority does not address the dissent’s statement. Nevertheless, for the reasons that follow, we conclude that the majority’s opinion and Supreme Court precedent do not permit the bringing of the section 1983 action that Justice Stevens suggested is available.

. We assume without deciding that the regulations are valid, as neither NJDEP nor St. Lawrence timely challenged them in the district court and our analysis does not turn on their validity. That being said, like the Court stated in Sandoval, we observe that there does seem to be considerable tension between the section 602 regulations proscribing activities that have a disparate impact and section 601's limitation to interdiction only of intentionally discriminatory activities. See Sandoval, 532 U.S. at _, 121 S.Ct. at 1517.

. The Court of Appeals for the Fifth Circuit recently in Banks v. Dallas Housing Authority, 271 F.3d 605, 609-10, indicated that a statutory obligation in 42 U.S.C. § 1437f(e) (repealed) to provide "decent, safe, and sanitary” housing was too vague to be judicially enforceable under section 1983, distinguishing Wright.

. On appeal, the defendants did not advance this argument even though the district court had relied on it. See Powell, 189 F.3d at 401.

. It cannot be argued plausibly that by holding in Powell that there was a private right of action under Title VI, we necessarily determined that the plaintiffs in Powell had a right enforceable under section 1983. Even if it could be so argued, however, the aspect of the opinion holding that there is a private right of action under Title VI did not survive Sandoval and thus the 1983 claim would not survive either. In any event, the district court in South Camden II did not determine that the plaintiffs had a right enforceable under section 1983 merely because in Powell we had determined that there was a private right of action enforceable under Title VI. Rather, the court in South Camden II made an independent examination of whether a section 1983 action was available, just as we do. Indeed, it hardly could have avoided making that analysis as it cited favorably Santiago v. Hernandez, 53 F.Supp.2d 264, 268 (E.D.N.Y.1999), for the point that "[i]t is conceptually possible for plaintiff who is the intended beneficiary of a statute to have a § 1983 action but not a private right of action, or vice versa....”

. Of course, when the issue was raised in a district court within the Sixth Circuit the court followed Loschiavo. See Lucero v. Detroit Public Sch., 160 F.Supp.2d 767, 781-85 (E.D.Mich.2001).

. To adjudge whether an implied right of action exists under a particular statute, courts employ a four-factor test the Court first articulated in Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). As the Court explained in Cannon:
In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,’ that is, does that statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purpose of the . legislative scheme to imply such a remedy for the plaintiffs? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to *789 infer a cause of action based solely on federal law?
Cannon, 441 U.S. at 688 n. 9, 99 S.Ct. at 1953 n. 9 (quoting Tex. & Pac. R. Co. v. Rigsby, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916)) (citations and emphasis omitted). Although not expressly, the Sandoval Court began, and ended, its analysis with the first factor, namely whether Congress intended to create a right in favor of the plaintiffs. See Sandoval, 532 U.S. at _, 121 S.Ct. at 1520-21.

. It is important to note that relying upon the Sandoval Court’s assessment of Congress’ intent in enacting section 602, set forth in the context of determining whether there is a private right of action for the purposes of determining whether an enforceable right exists, does not, as the district court found, conflate the distinction between rights and remedies. See South Camden II, 145 F.Supp.2d at 517 ("The essence of the NJDEP’s and [St. Lawrence]’s misunderstanding of Sandoval lies in their conflation of rights with remedies in their analysis of the Supreme Court's holding in Sandoval."). It is true, as the district court repeatedly stated, that "[t]he holding in Sandoval is explicitly limited to the determination that § 602 itself does not create a right of private action,” or in other words, a remedy. Id. at 518. It is also true, as the Sandoval Court stated and the district court emphasized, that this court is "bound by holdings, not language.” Sandoval, 532 U.S. at _, 121 S.Ct. at 1517. That being said, we are not precluded from utilizing the Court’s discussion of Congress’ intent in enacting Title VI, although raised in the context of whether Congress intended a remedy through section 602 directly, to help it discern whether Congress intended to create a right that is enforceable through section 1983. Doing so respects the difference between the Cort implied-right-of-action analysis and the Blessing "rights” analysis because it relies upon the factor common to both.

. St. Lawrence and NJDEP raise numerous other procedural and substantive arguments in support of their appeals. In view of our result, with one exception, we do not address them as the appeal is only from the granting of preliminary injunction that we are reversing on other grounds. Nevertheless, it is possible that on further proceedings the issues involved in those arguments may be significant and thus we want to make it clear that we are taking no position on those points. The one exception is NJDEP’s argument that the Eleventh Amendment bars this action to the extent that it "prohibits the retrospective revocation of [St. Lawrence’s] air permit.” Br. at 44. We are constrained to consider this argument as it is jurisdictional. See Chittister v. Dep’t of Cmty. and Econ. Dev., 226 F.3d 223, 227 (3d Cir.2000). After careful consideration, we have concluded that the argument is without merit, and we therefore reject it without discussion.

. The extent to which plaintiffs have already suffered a disparate impact of pollution is readily apparent from the factual summary set forth by the majority. See Maj. Op. at 775 ("As a result, Waterfront South, though only one of 23 Camden neighborhoods, hosts 20% of the city’s contaminated sites and, on average, has more than twice the number of facilities with permits to emit air pollution than exist in the area encompassed within a typical New Jersey zip code.”).